UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DESIRA VEGA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　Defendant. | No. 1:22-cv-00661-JLT-GSA<br><br>**FINDINGS AND RECOMMENDATIONS TO GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, TO REMAND FOR FURTHER PROCEEDINGS, AND TO DIRECT ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT COMMISSIONER OF SOCIAL SECURITY**<br><br>**(Doc. 15, 16)** |

### I. **Introduction**

Plaintiff Desira Vega ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act.

### II. **Factual and Procedural Background**

Plaintiff sought disability insurance benefits (which was withdrawn) and supplemental security income with an amended alleged disability onset date of February 29, 2020. AR 26. The Commissioner denied the application initially on June 19, 2020, and on reconsideration on August 20, 2020. AR 176–77; 206–07. Plaintiff appeared for a telephonic hearing before an Administrative Law Judge (the "ALJ") on May 28, 2021. AR 46–87. The ALJ issued an unfavorable decision dated June 22, 2021. AR 22–45. The Appeals Council denied review on March 29, 2022. AR 1–6.

### III. The Disability Standard

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted). If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the

claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).  While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience.  *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

**IV.     The ALJ's Decision**

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity from her application date (or amended alleged onset date) of February 29, 2020.  AR 28.  At step two the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease; obesity; carpal tunnel syndrome; anxiety; post-traumatic stress disorder ("PTSD"); and depression AR 28.  At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 29–31.

Prior to step four, the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform sedentary work as defined in 20 CFR 404.1567 (a) with the following limitations:

> . . . occasional climb, no ladders, ropes or scaffolds; occasional balance, stoop, kneel, crouch, and crawl; frequent handling and fingering; and must avoid hazards, including heights and moving machinery. She can understand, remember, and carry out simple, routine, repetitive instructions; can tolerate occasional interaction with the public; and requires low stress jobs, defined as no production rate paced work, only occasional changes in job setting, and only occasional decision-making responsibilities.

3

AR 32–38.

At step four the ALJ concluded that Plaintiff could not perform past relevant work as a pharmacy technician. AR 38. At step five, in reliance on the Vocational Expert's testimony (the "VE"), the ALJ concluded that Plaintiff could perform other jobs existing in significant numbers in the national economy: final assembler; inspector; and semiconductor bonder. AR 38–39. Accordingly, the ALJ concluded that Plaintiff was not disabled since the February 29, 2020, application date. AR 39.

## V. Issue Presented

Plaintiff asserts two claims of error: 1) the ALJ erred in rejecting the opinions of Drs. Siekerkotte, Wong, and Fast concerning Plaintiff's reaching limitations, and 2) the ALJ erred in rejecting the opinion of Dr. Izzi concerning Plaintiff's social interaction limitations. MSJ at 12, 16, Doc. 15.

### A. Legal Standard

Before proceeding to steps four and five, the ALJ must first determine the claimant's residual functional capacity. *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995). "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably

attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

For applications filed on or after March 27, 2017, the new regulations eliminate a hierarchy of medical opinions, and provide that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, when evaluating any medical opinion, the regulations provide that the ALJ will consider the factors of supportability, consistency, treatment relationship, specialization, and other factors. 20 C.F.R. § 404.1520c(c). Supportability and consistency are the two most important factors and the agency will articulate how the factors of supportability and consistency are considered. *Id.* "Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods v. Kijakazi*, 2022 WL 1195334, (9th Cir. Apr. 22, 2022) at *6.

**B.   Analysis**

    **1.   Drs. Siekerkotte, Wong & Fast regarding the Reaching Limitations**

On June 19, 2019, Dr. Siekerkotte conducted a consultative physical examination at the request of the agency. AR 460–65. Dr. Siekerkotte opined in relevant part that Plaintiff could never reach overhead and could occasionally reach forward with the right arm due to decreased right shoulder range of motion, but did not specify left sided reaching limitations. AR 464.

5

Similarly, at the initial level of review in June of 2020, Dr. Wong opined Plaintiff could occasionally reach in front and/or laterally and occasionally reach overhead with the right arm due to a decrease range of motion with the right shoulder, but did not identify left sided reaching limitations. AR 169-70. At the reconsideration level of review in August 2020, Dr. Fast opined that Plaintiff could occasionally reach overhead <u>bilaterally</u> "due to neck pain", but did not specify reaching limitations in other directions besides overhead. AR 201–02.

The ALJ identified the same reasoning for rejecting all three opinions:

> I have not adopted all of the limitations, such as to reaching with the right upper extremity as although Dr. Siekerkotte recorded some reduced range of motion in the right upper extremity, she had 5/5 strength, and the medical record indicates normal strength and motion in her extremities (Exhibits C6F/23; C10F/7; C13F). Further, the claimant reported being able to perform reaching tasks such as complete her laundry, prepare simple meals, and grocery shop, which activities not consistent with the reaching limitations opined (Exhibit C6E; HT).

AR 36.

### a. **Objective Evidence**

As to the ALJ's citation to records indicating "normal strength and motion in her extremities," Plaintiff contends "the ALJ's isolated discussion of normal findings is not substantial evidence when it is not representative of the overall record." MSJ at 15. Plaintiff emphasizes that "the record shows consistent examination findings of cervical spine tenderness, spasms, limited range of cervical motion, and tight right suboccipital/lev scap muscles (Ar. 498, 514, 516, 523, 556, 563, 590, 668, 741, 751)," as well as "imaging findings of advanced disc narrowing at C5-C6, moderate right advanced left neural foraminal stenosis secondary to uncinate process hypertrophy at C5-C6, and moderate neural foraminal stenosis on the left at C6-7. Ar. 490-91, 756." *Id.*

Plaintiff asserts that "The ALJ failed to mention any of this probative evidence and instead cherry picked from the record to reach his conclusion." *Id.* However, the ALJ did in fact mention each finding Plaintiff emphasizes. AR 33–34. What Plaintiff perhaps meant is that the ALJ only

mentioned those findings in her factual summary, but did not subsequently reconcile them with the finding that no reaching limitations were warranted. Here, the ALJ first summarized the evidence, then, when subsequently articulating findings and conclusions, the ALJ characterized the medical evidence already covered along with a representative sample of citations to the record. Structurally speaking, this is a reasonably sufficient way to "bridge the analytical gap." However, the cited records did not entirely comport with the ALJ's description, nor did they significantly undermine the three doctors' opinions as follows:

(1) The ALJ's first citation was to a primary care visit dated March 12, 2020, with NP Edwards for a follow up on chronic pain (Ex. C6F/23, AR 514). It does note normal strength, but no findings as to range of motion. This is not a countervailing finding juxtaposed to the findings identified by Drs. Siekerkotte and Fast, who attributed the reaching limitations to reduced right shoulder ROM, not reduced strength.

(2) The second citation (Ex. C10F/6, AR 636-37) is to an emergency department visit dated July 3, 2020, after Plaintiff fell and hit her head on a concrete floor. AR 636. The examination notes reflect "ROM intact spine and extremities", as well as "good muscle tone and movement of all extremities." AR 637. These examination notes are somewhat generalized as it relates to right shoulder strength and range of motion. The context of the visit also somewhat minimizes the importance of those findings. The concern was an acute head injury and neurological manifestations, and was not to assess joint by joint function. By contrast, Dr. Siekerkotte performed a consultative examination for the specific purpose of evaluating Plaintiff's fitness for work and opining about the same. Dr. Siekerkotte conducted a joint by joint analysis with ROM measurements specified by numerical degree and rendered an associated opinion identifying limitations on a function-by-function basis. That it is not to suggest this is

necessarily the only relevant examination in the record. However, generalized neurological findings from an ER visit for an acute head injury are not particularly comparable, nor significantly relevant, to Plaintiff's ability to use her right shoulder joint for reaching activities in the context of full time work.

(3) The third citation (Ex. C13/F, AR 781–90) is a May 10, 2021, neurology visit for a chief complaint of "consult for neurology." AR 787. The history of present illness (HPI) covers her spinal stenosis, nerve conduction tests, and carpal tunnel. AR 787. The physical exam reflects "Neurological: grossly intact motor and sensory examination." *Id.* Plan of care included: Lyrica and amitriptyline increased, a wrist brace was prescribed to use at night; "consider tapering down norco," "pain contract with PCP," "referral to pain management for assessment." *Id.* at 787–88. These notes suggest the visit was primarily management of neuropathic conditions (spinal stenosis, carpal tunnel), symptoms (burning, numbness), and treatment management (lyrica, amitriptyline, night splint). The neurologist deferred to pain management and PCP for management of norco. "Grossly normal motor and sensory examination" means largely normal not entirely normal, and in any case would only be another finding related to motor strength and sensation, not range of motion. There is little support for the assertion that the "grossly normal" finding included range of motion of the shoulder or of any joint. The finding was noted under the exam subcategory for "Neurological." Joint range of motion, by contrast, would be noted under the exam subcategory for "Musculoskeletal", which was absent from this examination. Neuropathic burning, numbness, and motor strength aside, this was not a significantly pertinent exam from the standpoint of <u>musculoskeletal</u> aches, pains, stiffness, and range of motion of the muscles and joints of the neck and shoulder.

In sum, none of the three cited exhibits specifically address shoulder range of motion and as such these generalized findings are not a sound basis to reject the three doctors' opinions about Plaintiff's reaching ability.

Defendant contends that the ALJ appropriately "placed Plaintiff's symptoms in context with her functional abilities and treatment history," in that the ALJ acknowledged range of motion deficiencies and other deficiencies Plaintiff emphasizes alongside normal findings such as normal strength and sensation, which was a sufficient effort to reconcile the findings in the record. Resp. at 6, Doc. 16.

The fact that Plaintiff maintained adequate motor strength and sensation notwithstanding her moderate to severe cervical spine stenosis is certainly relevant. However, deficiencies in strength and sensation are not the only relevant findings from a functional standpoint, nor are they the only potential manifestations of the cervical spine impairment. Again, the three doctors attributed the reaching limitations to reduced shoulder ROM and/or neck pain,[1] not reduced strength. Thus, there is little basis to reject the doctors' more expert opinions in favor of the ALJ's layperson opinion[2] that strength is more significant than ROM when assessing reaching ability.

### b.  **Testimony and Function Report**

The ALJ also noted that Plaintiff "reported being able to perform reaching tasks[3] such as complete her laundry, prepare simple meals, and grocery shop, which activities [are] not consistent

---

[1] Drs. Siekerkotte and Fast attributed the reaching limitations to reduced shoulder ROM, whereas Dr. Wong attributed it to neck pain. These are reasonably consistent opinions when viewed in context of the medical records showing Plaintiff had moderate to severe cervical foraminal stenosis, limited cervical ROM, tenderness and spasm about the cervical paraspinal muscles including trapezius and levator scapulae, muscles which are interconnected with the neck and shoulder area.

[2] Which is not to suggest the ALJ is prohibited from independently assessing clinical findings, as Plaintiff suggests in reliance on unpublished dicta. Reply at 2. Controlling authority directly refutes that. *Rounds v. Comm'r of Soc. Sec.*, 807 F.3d 996, 1006 (9th Cir. 2015), ("[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC."). However, it does not follow that an ALJ can "arbitrarily substitute his own judgment for a competent medical opinion," particularly about the same issue the doctor addressed. *Banks*, 434 F. Supp. 2d at 805.

[3] Though this is a subtle critique, the function report did not identify them as reaching tasks, nor did the testimony or questioning. A more accurate phraseology would be that Plaintiff reports she was able to perform various tasks including those mentioned, and those tasks logically involve at least some degree of reaching.

with the reaching limitations opined (Exhibit C6E; HT)." AR 35. Plaintiff contends these are not inconsistent with the reaching limitations opined, particularly when viewed in the context of other testimony reflecting her durational limits for these tasks and her need for help from her daughter. MSJ at 16. Defendant responds that Plaintiff simply presents an alternative view of the evidence, and that Plaintiff mistakenly suggests it was the ALJ's obligation to show Plaintiff was more capable than the doctors opined rather than Plaintiff's burden to prove disability. Defendant further emphasizes that the substantial evidence standard requires the ALJ to only identify more than a scintilla of evidence.

Whether the ALJ identified more than a scintilla of evidence is not determined by examining the cited daily activities in isolation, but in the context of the countervailing evidence. All other things being equal, testimony as to various activities ostensibly involving some degree of reaching (coupled with examination findings showing normal strength) may or may not be more than a scintilla. But here, all other things are not equal. The countervailing evidence is much more significant: (1) all three doctors' opinions as to occasional rights sided reaching (including the consultative examiner) which identified the causal findings in support; (2) moderate to severe cervical spine stenosis; and (3) examination findings of decreased cervical and shoulder ROM, tenderness, and spasm of the surrounding muscles.

Defendant further emphasizes Plaintiff's affirmative response when asked if she could raise her hands above her head (testimony the ALJ covered, but did not specifically reconcile with the opinion evidence). AR 33, 67. Here, Plaintiff's testimony is simply irreconcilable with Dr. Siekerkotte's opinion that Plaintiff could never reach overhead with her right arm. But a broader inference is not supportable, particularly given that the ALJ posed the question as a closed ended, yes/no question, among a series of similar questions addressing various functional capacities. Neither the cited testimony, nor the function report in its description of the nature and duration of

her activities, significantly conflicts with the remainder of Dr. Siekerkotte's opinion, or that of Drs. Fast and Wong as to occasional reaching (1/3 of an eight hour day).[4] These three doctors' opinions (though distinct in subtle ways) all agreed that Plaintiff was limited to occasional overhead reaching with the right upper extremity, and two out of the three (Drs. Siekerkotte and Wong) agreeing that Plaintiff was limited to occasional reaching in other directions with the right upper extremity—and the weight of this evidence strongly supports this limitation.

Although there is no genuine dispute of fact on the necessity of the limitation to <u>occasional reaching in all directions with the right upper extremity</u>, the impact of such a limitation on the vocational analysis at steps four and five is not clear.  As such, remand is appropriate for the ALJ to conduct a new hearing, incorporate the limitation as underlined above into the RFC, and pose it to the Vocational Expert.

### **2.    Dr. Izzi and the Social Interaction Limitations**

On June 22, 2019, Dr. Izzi conducted a consultative psychological examination at the request of the agency.  AR 466–69.  Plaintiff emphasizes Dr. Izzi's opinion that her ability to get along with peers, or be supervised in a work-like setting, would be moderately limited by her mood disorder. AR 469.

The ALJ addressed the opinion as follows:

> The claimant's mental impairments support social limitation, but I find her reported ability to get along with others, treatment providers, and live with family are factors that are not consistent with limitation in interacting with supervisors and coworkers, and I have accounted for her moderate social limitation with jobs that require no more than occasional interaction with the public.

It should require no explanation that living and interacting with family members and interacting with treating providers is not necessarily indicative of social capacity in the workplace.

---

[4] Dr. Fast is the only one who opined that the limitations were bilateral, and in that respect his opinion is outweighed by the other two.

Defendant also argues that the RFC adequately accounts for Dr. Izzi's opinion. Defendant cites *Rogers* for the proposition that a moderate impairment in social functioning is appropriately captured in an RFC finding for simple and repetitive tasks. *Rogers v. Commissioner of Soc. Sec. Admin.*, 490 Fed. Appx. 15 (9th Cir. 2012) (unpublished memorandum). Plaintiff cites caselaw noting simple/repetitive tasks is not a catch-all for all moderate limitations in mental functioning.[5] Other courts have explained that "Moderate mental functional limitations are not per se disabling, nor do they preclude the performance of jobs that involve simple, repetitive tasks." *Herrera-Schmitz v. Comm'r of Soc. Sec.*, 2015 WL 5258701, at *10 (N.D. Cal. Sept. 9, 2015) (citing cases). Similarly, courts have observed that the SSA "defines a moderate limitation as there is more than a slight limitation in this area, but the individual can still function satisfactorily." HALLEX 1-2-5-20, 1992 WL 601808; *see also Cantu v. Colvin*, 2015 WL 1062101, at *13-14 (N.D. Cal. Mar. 10, 2015). However, this caselaw is not controlling. Moreover, Dr. Izzi did not identify limitations on task complexity in isolation, or limitations on social interaction in isolation. Rather, Dr. Izzi articulated the interrelationship between the two types of limitations as they apply to this particular claimant:

> The present evaluation suggests that the claimant <u>does appear capable of performing a simple and repetitive type task</u> on a consistent basis over an eight-hour period. Her ability to get along with peers or be supervised in work-like setting would be moderately limited by her mood disorder. the claimant's mood disorder can be expected to fluctuate as her subjective perception of pain fluctuates. <u>Any significant fluctuation of mood would limit the claimant's ability to perform a complex task</u> on a consistent basis over an eight-hour period. On a purely psychological basis, the

---

[5] Emma D. A. W. v. Kijakazi, 2:22-CV-2721-MAR, 2023 WL 402117, at *6 (C.D. Cal. Jan. 25, 2023), judgment entered, 2:22-CV-2721-MAR, 2023 WL 413462 (C.D. Cal. Jan. 25, 2023) (The Court notes that, generally speaking, the district court case law is split "but tends to favor the view" that a restriction to simple, routine tasks with limited public contact does not account for the limitations Dr. Stewart identified in Plaintiff's ability to deal with workplace stress and to adjust to changes in the workplace.") (quoting Harrell v. Kijakazi, 2021 WL 4429416, at *7 (E.D. Cal. Sept. 27, 2021) (finding that the weight of authority refutes the "notion that a limitation to simple /routine tasks with limited public contact adequately accounts for other limitations in social interaction, maintaining attendance, completing a normal workday without interruptions from a psychiatric condition, and handling work related stressors") (collecting cases); and citing Berenisia Madrigal v. Saul, 2020 WL 58289, at *5 (E.D. Cal. Jan. 6, 2020) (a restriction to simple, routine tasks does not account for mental limitations in ability to complete a normal workday or workweek without interruptions from a psychiatric condition and the ability to deal with stress and changes encountered in the workplace).

>claimant appears capable of responding to usual work session situations regarding attendance and safety issues. On a purely psychological basis, the claimant appears capable of dealing with changes in a routine work setting.

AR 469 (emphasis added).

Simply put, Dr. Izzi opined that Plaintiff could perform a *simple and repetitive* task on a consistent basis over an eight-hour day. Dr. Izzi went on to explain how and under what circumstances Plaintiff's social limitations would manifest. Her ability to get along with peers or be supervised would be limited by her mood disorder which, in turn, would fluctuate depending on her subjective perception of pain. Any significant fluctuation "would limit the claimant's ability to perform a complex task" (emphasis added)—but importantly, it does not state that mood fluctuation would limit her ability to perform a *simple and repetitive* task. Thus, it appears Plaintiff could perform simple and repetitive tasks irrespective of mood fluctuations and associated social difficulties.

Finally, Plaintiff suggests that the ALJs intention was clearly to reject Dr. Izzi's opinion of social limitations despite Defendant's suggestion to the contrary. Reply at 3. If the RFC does in fact capture Dr. Izzi's opinion of social limitations, the ALJ's intention to reject it is irrelevant. Conversely, any improper reasoning by the ALJ in support is equally irrelevant. A plain reading of Dr. Izzi's full explanation quoted above reflects that Plaintiff can perform simple and repetitive tasks notwithstanding her social limitations. Thus, there is no basis to reexamine the mental RFC on remand.

### VI.  Conclusion

Remand is appropriate for the ALJ to conduct a new hearing, incorporate Plaintiff's limitation to occasional reaching in all directions with the right upper extremity into the RFC, pose the same to the VE, proceed through the sequential analysis as necessary, and issue a new decision.

### VII.  Recommendations

For the reasons stated above, the recommendation is as follows:

1. That Plaintiff's motion for summary judgment (Doc. 15) be **GRANTED**

2. That Defendant's cross-motion (Doc. 16) be **DENIED**

3. That the matter be remanded to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with the Findings and Recommendations

4. That the Court Clerk of Court be directed to enter judgment in favor of Plaintiff Desira Vega and against Defendant Commissioner of Social Security.

### VIII. Objections Due Within 14 Days

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these Findings and Recommendations, any party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **March 11, 2024**                    **/s/ Gary S. Austin**
                                               UNITED STATES MAGISTRATE JUDGE